UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA, : 18 Cr. 768 (RMB)

-v- :

DARNEL HOOKER, :

Defendant. :

-----------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DARNEL HOOKER'S MOTION FOR COMPASSIONATE RELEASE**

DAVID E. PATTON
Federal Defenders of New York, Inc.
Attorney for Mr. Hooker
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (646) 745-4899

ANNALISA MIRÓN
Of Counsel

Government to respond by 8/17/2020 with input from BOP.

SO ORDERED:
Date: 8/3/2020
Richard M. Berman, U.S.D.J.

TO: AUDREY STRAUSS, ESQ.
Acting United States Attorney
Southern District of New York
One St. Andrews Plaza
New York, New York 10007

Attn.: ANDREW K. CHAN, Esq.
Assistant United States Attorney
Southern District of New York

Darnel Hooker is currently serving 58 months at the Metropolitan Correctional Facility (MCC). He has medical complications, including shortness of breath and frequent chest pains due to a serious medical injury that occurred in 2016. Mr. Hooker has a twice-ruptured lung that required multiple surgeries. His injury makes him particularly vulnerable to the severe, even fatal consequences of COVID-19, if he contracts it while incarcerated. The risk of contracting COVID-19 is especially high at MCC. On April 28, 2020, five inmates filed a class action lawsuit against the MCC for its failure to observe effective social distancing and quarantining measures, including providing masks and safety equipment to inmates, infrequent sanitization of public or shared surfaces, and delayed medical attention for those with symptoms of the virus.[1] The judge overseeing the litigation, Judge Ramos, determined that the facility's ad hoc measures lacked common sense and jeopardized the lives of dozens of inmates.[2] As a result of the MCC's failures, many inmates have experienced debilitating coughs, aches, and a host of other symptoms.

The spread of COVID-19 is endemic to BOP correctional facilities nationwide. As of the date of this letter, 3,035 federal inmates and 500 BOP staff have tested positive for COVID-19.[3] There have been 103 inmate deaths and 1 BOP staff member death attributed to the virus.[4] The majority of inmates who have died since March 28, 2020, the day MCC went on lockdown, have

---

[1] *Fernandez-Rodriguez et al. v. Licon-Vitale*, Class Action Complaint and Petition for Habeas Corpus, 1:20-cv-03315 (ER) (S.D.N.Y. April 28, 2020).

[2] Larry Neumeister, *Judge: NY lockup's COVID-19 response lacked common sense*, ABC News, July 2, 2020, https://www.sfchronicle.com/news/article/Judge-NY-lockup-s-COVID-19-response-lacked-15383594.php.

[3] BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/.

[4] *Id.*

had "long-term, pre-existing medical conditions which the CDC lists as risk factors for developing more severe COVID-19 disease."[5] As described below, Mr. Hooker's lung injuries significantly impact his respiratory system, and where the conditions of confinement make it impossible for a person to socially distance or otherwise adequately protect themselves, the risk of serious or fatal life consequences is only amplified.

The Court has jurisdiction to reduce a term of imprisonment after considering the factors set forth in § 3553(a) if it finds "extraordinary and compelling" reasons warrant a reduction. 18 U.S.C. § 3582(c)(1)(A)(i). Given Mr. Hooker's precarious health status, his conditions of confinement, and his rehabilitative efforts at MCC, the Court is authorized to reduce his term of imprisonment and grant his motion for compassionate release under Section 603(b)(1) of the First Step Act. If Mr. Hooker is released, he will live in the Bronx with his supportive and loving mother, April Hooker. Ms. Hooker is gainfully employed and her apartment offers enough space for Mr. Hooker to safely quarantine along with his sister and brother. While Mr. Hooker has secured employment if he were released, he is also eager to start educational and vocational programming from his mother's home while he finishes his sentence.

Mr. Hooker's sentencing and incarceration record suggests that he is remorseful and rehabilitated. He has taken several hours of educational and vocational courses in the MCC. Two corrections counselors commended Mr. Hooker for his work ethic and overall behavior. At sentencing, this Court applauded Mr. Hooker for sharing "one of the most insightful…remarks from a defendant" who was acknowledging the seriousness of his offense. ECF No. 50 at 13. Thus, allowing Mr. Hooker to live at home to serve out the remainder of his sentence will appropriately balance the goals of rehabilitation, punishment, and deterrence, *see* 18 U.S.C. §

---

[5] *See* Bureau of Prisons Press Releases, https://www.bop.gov/resources/press_releases.jsp.

3553(a), without exposing him to the heightened chance of contracting COVID-19 while incarcerated.

For these reasons and those set forth below, I respectfully request that the Court grant Darnel Hooker compassionate release, resentence him to time served pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), and convert the unserved portion of his custodial sentence to home confinement and supervised release.

## Background

On July 2, 2019, Mr. Hooker pled guilty to one count of conspiring to commit an offense against the United States, in violation of 18 U.S.C. § 371, by being a felon in possession of ammunition. Dkt. No. 38. Mr. Hooker was sentenced to 58 months of incarceration and 3 years of supervised release following incarceration. Sentencing Tr. 14-15. The government requested the statutory maximum of 60 months incarceration due to Mr. Hooker's criminal history. This Court, taking into account Mr. Hooker's admission of guilt, imposed a lower sentence to "symbolically demonstrate that [the Court is] interested in seeing [Mr. Hooker's] recovery and [his] becoming a productive citizen." *Id*. at 14. As described below, Mr. Hooker has become the productive citizen this Court hoped for.

Since October 12, 2018, Mr. Hooker has had a near-perfect disciplinary record. Mr. Hooker has worked and participated in programs offered by the Bureau of Prisons while incarcerated. Sentencing Tr. 6. Two corrections counselors wrote to the Court commending Mr. Hooker for his work ethic and overall behavior while incarcerated. Sentencing Tr. 8. They described Mr. Hooker as a "model inmate" who attended courses, worked, and who "has shown commitment in utilizing his incarceration for a positive future." *See* ECF No. 44, Ex. 5. After almost 16 months of incarceration at MCC, he received a sanction for

possessing a cell phone to call his family, which resulted in a 41 day good time reduction. But he has otherwise worked hard to abide by the rules and engage in available programming. He completed several education and vocational courses at the MCC, including courses on conflict resolution, leadership and influence, marketing, entrepreneurship, and soft skills. *See, e.g.*, ECF No. 44, Ex. 5; ECF No. 47. He was also recognized for assisting the Medical Department as an orderly. ECF No. 44, Ex. 5. His actions while incarcerated demonstrate a commitment to personal growth and advancement.

On March 27, 2020, through counsel, Mr. Hooker filed a petition with the warden of MCC seeking compassionate release. Letter to Warden, attached as Exhibit A. Per its own regulation concerning requests for compassionate release, "the Bureau of Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request." 28 C.F.R. § 571.61(b). As many as 127 days have elapsed since Mr. Hooker's release request, which far exceeds the 30-day exhaustion requirement.

**A. The COVID-19 pandemic has surged through the BOP**

Courts are familiar with the danger that COVID-19 poses to incarcerated individuals. *See United States v. Gentille*, 19 Cr. 590 (KPF), 2020 WL 1814158, at *3 (Apr. 9, 2020) (describing the spate of 3582(c)(1)(A) motions from defendants "who are understandably worried about (and at particular medical risk for) contracting COVID-19…recognizing the speed with which the virus spreads, the impracticability of social distancing in federal prison, and the marked deficiencies in hygiene and medical care."). The scope of this danger has increased dramatically on a national and local level, since the Court granted Mr. Gentille's motion. On April 9, 2020,

the virus had infected 393,030 people in the United States and killed 1,856.[6] At that time, BOP reported 235 positive cases for federal inmates, 85 for staff, and 8 inmate deaths.[7] By July 31, 2020, the virus had infected 4,405,932 people in the United States and killed 150,283.[8] In New York City alone, there have been 221,534 confirmed cases and 18,898 confirmed deaths.[9] As of the date of this letter, the BOP reports 3,035 confirmed cases of COVID-19 among inmates, 500 among staff, and 103 inmate deaths—a 1191% increase in positive inmate cases and a 1187% increase in inmate deaths since April.[10]

---

[6] *Number of cumulative cases of coronavirus (COVID-19) in the United States from January 22 to July 30, 2020, by day*, Statista, https://www.statista.com/statistics/1103185/cumulative-coronavirus-covid19-cases-number-us-by-day.

[7] BOP, *COVID-19 Cases*, April 2020, *supra* note 2.

[8] Available at CDC, Cases of Coronavirus Disease (COVID-19) in the U.S.. https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

[9] NYC Health, *COVID-19: Data*, at https://www1.nyc.gov/site/doh/covid/covid-19-data.page.

[10] BOP, *COVID-19 Cases*, *supra* note 2.

The rapid proliferation of the virus within the federal prison system is terrifying.

But these results are not surprising. "[C]onditions of confinement—sharing small cells, eating together, using same bathrooms and sinks, delays in medical evaluation and treatment, and rationed access to soap—make prisons more potentially conducive to the transmission of COVID-19 than elsewhere." *United States v. Haney*, 2020 WL 18211988, at *6 (S.D.N.Y. Apr. 13, 2020). "Jails and prisons are powder kegs of infection. People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment." *United States v. Skelos*, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020). "[I]t is beyond dispute that COVID-19 is much more easily transmitted, and is thus particularly dangerous, in the prison environment." *United States v. Canale*, No. 17-CR-286 (JPO), 2020 WL 1809287, at *1 (S.D.N.Y. Apr. 9, 2020). "One need

only look at the tightly-packed dormitories of Unit 11-South — containing medically vulnerable inmates — to see how quickly the virus can spread in the absence of an effective isolation protocol." *Fernandez-Rodriguez et al. v. Licon-Vitale*, Opinion, 1:20-cv-03315 (ER) (S.D.N.Y. July 2, 2020). Moreover, the CDC identifies social distancing as "a cornerstone of reducing transmission of respiratory diseases such as COVID-19." *See* CDC Correctional Facility Guidance at 4. The structural limitations of BOP facilities enhance the spread of the virus.

The MCC, where Mr. Hooker is incarcerated, conforms to this alarming trend. *See generally Fernandez-Rodriguez et al. v. Licon-Vitale*, Class Action Complaint and Petition for Habeas Corpus, 1:20 Cv. 03315 (ER) (S.D.N.Y. Apr. 28, 2020), ¶ 2 (describing the MCC's efforts to stop the spread of COVID-19 within its walls as "a mixture of ineptitude and indifference."). As described below, the facility's ad hoc measures lack common sense and jeopardize the lives of dozens of inmates.[11]

**B. Conditions of confinement at MCC are terrifying**

In response to an administrative order issued by Chief Judge Mauskopf regarding the MCC's response to the COVID-19 pandemic, BOP confirmed that as of July 30, 2020, over 70 people have tested positive for COVID-19 in the MCC. *See* July 30, 2020 Letter from Wardens at MCC and MDC to Chief Judge Mauskopf, attached as Exhibit B. Of that total number, 27 are inmates.[12] While BOP insists that it is increasing social distancing in the facilities, as a structural matter that is nearly impossible. Many of the cells are shared by 2 to 6 inmates who necessarily share bunk beds, toilets, and other confined spaces.

[11] *See supra* note 1.

[12] *Id.*

Moreover, the effects of COVID-19 have already been felt in MCC to a devastating degree. As Judge Ramos noted in *Fernandez-Rodriguez et al. v. Licon-Vitale*, "[i]n March and April, at least five percent of the MCC's inmates fell ill with COVID-19."[13] "[M]any [inmates] were debilitated by coughs that wracked their bodies, fatigue so extreme they could not rise from bed, and a host of other symptoms."[14] Today, MCC reports 22 inmates have tested positive for the virus.[15] But these numbers vastly understated the true figures. In most facilities, including MCC, the BOP only tests "[s]ymptomatic inmates with exposure risk factors."[16] But many carriers display no symptoms at all. *See* Arons et al., *Presymptomatic SARS-CoV-2 Infections and Transmission in a Skilled Nursing Facility*, New England Journal of Medicine (Apr. 24, 2020) (finding that in study population, "more than half of the residents with positive tests were asymptomatic at the time of testing" and because asymptomatic carriers play a significant role in spread of the coronavirus, "[i]nfection-control strategies focused solely in symptomatic resides [a]re not sufficient to prevent transmission" after the virus' introduction into a facility.).[17]

Where the BOP has conducted large scale testing, the results are ominous. *See* Richard Winton, *Coronavirus outbreak at Terminal Island prison worsens: 5 dead, 600 infected*, LA

---

[13] *Fernandez-Rodriguez et al. v. Licon-Vitale*, Opinion, 1:20-cv-03315 (ER) (S.D.N.Y. July 2, 2020) at 2.

[14] *Id*.

[15] BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/.

[16] BOP, *BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp.

[17] *Presymptomatic SARS-COV-2 infection and Transmission in a Skilled Nursing Facility*, New England Journal of Medicine, https://www.nejm.org/doi/full/10.1056/NEJMoa2008457?query=recirc_curatedRelated_article.

Times (Apr. 30, 2020) (of the 1053 inmates at FCI Terminal Island, 600 tested positive, the vast majority of whom were asymptomatic);[18] *see also* BOP, *COVID-19 breakdown by facility* (883 positive inmates out of a population of 1162 at Lompco FCI; 587 positive inmates out of 1467 inmates at Fort Worth FMC).[19]

COVID-19 is spreading at a dramatic, alarming rate throughout the Bureau of Prisons, including at MCC.

**C. Mr. Hooker's respiratory illness places him at high risk of suffering severe consequences from COVID-19.**

As described in the Presentence Report (and medical records obtained by the Probation Department), Mr. Hooker has long suffered from an acute respiratory illness due to a twice ruptured lung, *see* BOP Medical Records 2020, submitted under seal as Exhibit C, that affects his ability to breathe. In 2016, Mr. Hooker underwent surgery due to a collapsed lung. He was admitted to St. Barnabas Hospital where medical staff determined that his right lung was deflating. Soon after his release, Mr. Hooker experienced shortness of breath and chest pains. He was admitted to Elmhurst Hospital where it was determined that he had a large pneumothorax or a collapsed lung on his right side. Mr. Hooker underwent a second surgery but his symptoms—shortness of breath and chest pains—continue to this day.

---

[18] Richard Winton, *Coronavirus outbreak at Terminal Island prison worsens: 5 dead, 600 infected*, LA Times, Apr. 30, 2020, https://www.latimes.com/california/story/2020-04-30/la-coronavirus-outbreak-terminal-island-prison-worsens.

[19] BOP, COVID–19 breakdown by facility, https://www.bop.gov/coronavirus/. Facility populations available at https://www.bop.gov/about/statistics/population_statistics.jsp.

According to the CDC, respiratory issues are among the conditions most clearly associated "with increased illness severity and adverse outcomes."[20] Courts have granted compassionate release motions for inmates who suffer from respiratory illnesses that impact their ability to breathe. This includes inmates who suffer from asthma. *See, e.g., United States v. Park*, 1:16-cr-00473-RA-1, 2020 WL 1970603 (S.D. N.Y. Apr. 24, 2020); *United States v. Smith*, 1:12-cr-00133-JFK-1, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020); *United States v. Hernandez*, 1:18-cr-00834-PAE-4, 2020 WL 1684062 (S.D. N.Y. Apr. 2, 2020). Courts have also granted compassionate release for inmates suffering from sleep apnea. *See, e.g., United States v. Rivera*, 1:86-cr-01124-JFK-4, 2020 WL 2094094 (S.D.N.Y. May 1, 2020); *United States v. Scparta*, 1:18-cr-00578-AJN-1, 2020 WL 1910481 (S.D.N.Y. Apr. 20, 2020); *United States v. Gross*, 1:15-cr-00769-AJN-3, 2020 WL 1673244 (S.D.N.Y. Apr. 6, 2020). The impact of COVID-19 more generally has also provided grounds for this Court to grant compassionate release. *United States v. Johnson*, 1:17-cr-00482-JSR-1, Dkt. No. 116 (S.D. N.Y. May 1, 2020) (Rakoff, J.). Due to his twice-ruptured lung, Mr. Hooker is often short of breath and unable to sleep. He cannot sleep on his stomach because of the injury. Sleeping on his back is painful as he also had surgery for a slipped disk in his mid-back. *See* PSR at 26. If Mr. Hooker contracted COVID-19, the virus would exacerbate his pre-existing conditions, namely shortness of breath and chest pains, and impede his sleep. [21] Mr. Hooker's twice-failing lung impacts his

---

[20] Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), Ctr. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

[21] *Coronavirus Disease 2019 (COVID-19): Symptoms*, Ctrs. For Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last updated May 13, 2020).

susceptibility to the effects of COVID-19, and coupled with his record in prison, warrant consideration for his release.

### D. The specific conditions of Mr. Hooker's confinement increase the risk that he will contract COVID-19

Despite the documented outbreak of COVID-19 at MCC, and Mr. Hooker's own efforts to do everything he can to protect himself, it is impossible for him to practice social distancing, control his exposure to other inmates, practice increased hygiene, wear protective clothing, obtain specific products for cleaning or laundry, avoid high-touch surfaces, sanitize his own environment, or follow other necessary practices for protecting himself.

Mr. Hooker is locked in a very small, two-person cell, which is more appropriate for one person but where he shares a bunk bed with his cellmate. There are no barriers to physical contact in the cell. He and his cellmate are free to walk around the confined cell space. While they are required to wear masks, it is near-impossible to maintain one strapped to the face for days on end. Because the facility is on a modified lockdown, his tier is only permitted outside of their cells once every other day, for a maximum of two hours. As a result, Mr. Hooker is only allowed to take showers once every two days. When he is allowed out of his cell to use the telephones, computers, and showers, he must do so in groups of as many as 10. He is necessarily in close proximity to other inmates and to unit staff who come and go from the facility each day. Moreover, there are no lines directing the flow of traffic in the MCC. While correctional officers bring food to the inmates' cell, they are not always wearing masks or gloves. Mr. Hooker's temperature is taken at most once per week.

Because the MCC has struggled to provide adequate testing and social distancing protocols, thereby jeopardizing the health and safety of its roughly 760 inmates, this Court, after considering the requisite § 3553(a) factors, should grant Mr. Hooker compassionate release.

## Argument

### I. Mr. Hooker has demonstrated "extraordinary and compelling reasons" warranting a reduction in sentence.

Section 3582(c)(1)(A)(i) empowers this Court to order compassionate release if "extraordinary and compelling reasons" so warrant. Here, Mr. Hooker's underlying physical health conditions place him at high risk of severe illness, and even death should he contract COVID-19 while incarcerated at MCC. When combined with his excellent rehabilitative efforts, his release plan and supportive family, and after considering all of the factors set forth at 18 U.S.C. § 3553(a), the Court should find that Mr. Hooker has demonstrated extraordinary and compelling reasons warranting a reduction of sentence. *See generally*, *United States v. Pacheco*, 1:12-cr-00408 (JMF) (S.D.N.Y. July 29, 2020). The Court should grant Mr. Hooker compassionate release under 18 U.S.C. § 3582 and sentence him to time served, with home confinement and supervised release.

### A. Legal framework

As amended by the First Step Act, §3582(c)(1)(A)(i) provides that:

> the court, upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in §3553(a)to the extent that they are applicable, if it finds that . . .extraordinary and compelling reasons warrant such a reduction . . .and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

The "applicable policy statement[],"U.S.S.G. § 1B1.13, authorizes a sentence reduction if "extraordinary and compelling reasons warrant the reduction" and "the defendant is not a

danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g).” §§ 1B1.13(1) and (2).

Application Note 1 to § 1B1.13—which has not been updated since passage of the First Step Act—defines “extraordinary and compelling reasons” to include terminal illness, age, family circumstances concerning the ability to provide care for a child or spouse, and a catchall provision, “other reasons.” This list is illustrative, and not exhaustive. Courts have the independent authority, apart from the Sentencing Commission or the Bureau of Prisons to determine what constitutes “extraordinary and compelling reasons” and are not limited by the examples in Application Note 1 or Program Statement 5050.50. *United States v. Haynes*, 2020 WL 1941478, at *11–15 (E.D.N.Y. Apr. 22, 2020) (RJD) (so ruling, and collecting cases); *United States v. Rodriguez*, 2020 WL 1627331, at *2–6 (E.D. Pa. Apr. 1, 2020)(same). This Court can consider all of Mr. Hooker’s personal circumstances, as well as the unprecedented public health crisis created by the COVID-19 pandemic, in deciding whether to grant compassionate release. *See id*.

**B. Mr. Hooker’s physical injury, coupled with the prevalence of COVID-19 at MCC, Mr. Hooker’s excellent rehabilitative efforts, and his concrete plan for reentry into the community, constitute “extraordinary and compelling reasons” warranting release under § 3582(c)(1)(A)(i).**

In determining whether a movant’s claims warrant compassionate release, courts consider his or her susceptibility to the threat of COVID-19, the correctional facility’s response to the spread of the virus within its walls, and the movant’s rehabilitative efforts and reentry plan.

In *United State v. Pacheco*, the Court granted compassionate release for an inmate whose history of drug use, which placed him at risk of respiratory and pulmonary complications from the virus, was indisputably at a higher risk of contracting and dying from COVID-19. *See* 1:12-

cr-00408 (JMF) (S.D.N.Y. July 29, 2020). "[I]t denies reality to suggest, let alone hold, that the threat of COVID-19 to those in prison does not qualify as an extraordinary and compelling reason to consider the early release of those in prison." *Id.* Darnel Hooker has suffered serious physical injury that impacts his respiratory system and places him at high risk of suffering severe, even fatal consequences if he contracts COVID-19 while incarcerated.. He has a twice-ruptured lung. The injury causes him shortness of breath and chest pains. The risk to Mr. Hooker is heightened by the conditions of confinement at MCC: the inability to socially distance or follow the other CDC recommendations for protecting oneself, the lack of systemic testing and monitoring inmates, and the fact that MCC is in the midst of significant COVID-19 outbreak. *See* Background Sections A & B, *supra.*

Since the start of Mr. Hooker's incarcerated, he has maintained a near-perfect disciplinary record. *See* Background Section. Mr. Hooker's reputation among the staff is favorable. *Id.* He has worked and participated in programs offered by the Bureau of Prisons, receiving praise from his superiors who refer to him as "a model inmate". *Id.* He also completed several education and vocational programs at the MCC. *Id.* His actions signal that he is committed to personal growth and advancement.

**C. The 3553(a) factors support a reduction in sentence**

Section 3582(c)(1)(A)(i) instructs a court to consider "the factors set forth in § 3553(a) to the extent that they are applicable." Those factors favor reducing Mr. Hooker's sentence. In particular, for the reasons described above, Mr. Hooker's history and characteristics, §3553 (a)(1), including his commendable conduct while incarcerated, support this request, as does the need to provide medical care in the most effective manner, §3553(a)(2)(D). *See United States v. Connell*, ___ F. Supp. 3d ___, 2020 WL 2315858, *5 (N.D. Ca. May 8, 2020) (explaining that

keeping a high-risk person incarcerated is not the "most effective manner" of mitigating the risk of his contracting COVID-19).

Releasing Mr. Hooker to home confinement also comports with the other 3553(a) factors, including the need to provide just punishment, and afford adequate deterrence. The Court should recognize that these last several months of incarceration have been especially difficult and punitive for Mr. Hooker, as fear of the pandemic has gripped inmates at MCC. Inmates are subject to far greater restrictions on their ability to move around and engage in positive programming, while remaining unable to adequately protect themselves from COVID-19, terrified of contracting the virus, and terrified of each other, as everyone is now viewed as a potential source of disease or death. Mr. Hooker's incarcerative experience has been highly punitive, and—to the extent Mr. Hooker needed to be specifically deterred—that purpose has also been satisfied.

## II. Mr. Hooker exhausted his administrative remedies

On March 27, 2020, defense counsel filed a request for compassionate release on behalf of Mr. Hooker to the Warden of MCC. *See* Exhibit A. More than 30 days have passed without an answer. Thus, the Bureau of Prisons was given full opportunity to evaluate Mr. Hooker's request and he has exhausted his administrative remedies.

## III. Mr. Hooker has a stable home to live in if released to home detention

If released, Mr. Hooker will move to the Bronx to live with his supportive and loving mother, April Hooker. As indicated in the PSR, Ms. Hooker has been employed for many years with the New York City Police Department at 1 Police Plaza in Manhattan. *See* PSR at 13. She lives in a 3-bedroom apartment with 2-baths. Currently living with Ms. Hooker are Mr. Hooker's

sister and brother. The spacious apartment offers enough distance for Mr. Hooker to safely quarantine. Beyond that, Mr. Hooker's family can financial support as he completes his sentence to home confinement. Mr. Hooker is interested in continuing educational and vocational training online from home as he awaits the opportunity to work outside again. He has already secured interest from former employers who are interested in re-hiring him. All to say that Mr. Hooker is set on continuing to become the productive citizen that this Court hoped he would become.

## CONCLUSION

This Court should grant Mr. Hooker's motion, reduce his sentence to time served, convert the unserved portion of his sentence to a term of supervised release, and modify the conditions of supervision as appropriate, including by ordering a term of home conferment for the unserved portion of his sentence.

Dated:    New York, New York
             July 31, 2020

                                                    /s/
                                           Annalisa Mirón
                                           Ass't Federal Defender
                                           (212) 417-8780